FARMERS STATE BANK OF EWING, APPELLANT, V. LYLE P. DIERKS ET AL., APPELLEES.

289 N. W. 860

FILED JANUARY 26, 1940. No. 30730.

*Jackson & Rice,* for appellant.

*J. J. Harrington* and *John M. Dierks, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

SIMMONS, C. J.

The plaintiff, a judgment creditor of the defendant M. H. Dierks, brought this action to set aside a conveyance of land from its debtor, M. H. Dierks, to his son, Lyle P. Dierks, a defendant. The defendants prevailed in the court below, and plaintiff appeals. For convenience, in reciting the evidence, the judgment debtor will be referred to herein as the father and his grantee as the son.

In its petition plaintiff alleges its corporate capacity; a loan to the father of $3,700, evidenced by promissory notes, the maturity of the notes, its demand for payment and his refusal to pay; suit upon said notes, the recovery of judgment thereon, that the judgment is final and unpaid; the relationship of the parties; the conveyance by the father to the son, after the maturity of the notes, but prior to the judgment, of approximately 4,000 acres of land in Holt and Wheeler counties "for the sole purpose and intent of hindering, delaying and defrauding the creditors of said M. H. Dierks, of their lawful rights and debts, and especially for the purpose and with the intent of hindering,

delaying and defrauding plaintiff herein in the collection of the aforesaid judgment and indebtedness;" that, by reason thereof, the conveyance is absolutely void as against the plaintiff. Plaintiff prayed that, as against it, the conveyance be annulled and set aside, that its judgment be decreed to be a lien upon the real estate superior to the interest and lien of the son, and for equitable relief.

The son (and his wife), answering plaintiff's petition, admits plaintiff's corporate capacity, the recovery of the judgment against the father, the relationship of the parties, the conveyance of the land in controversy from the father (and wife) to the defendant son, and the recording of the deed; and generally denies all other allegations of plaintiff's petition. Further answering, defendant son and his wife allege the sale and purchase of the land for a valuable and adequate consideration; that the son paid the full and fair market value for said land (reciting an alleged consideration to which he later testified) ; that the debts of the father to the son were actual, subsisting, and just obligations; that, in purchasing the land, he acted in good faith and for no other purpose than to secure his just demands owing him by the father; and that since October, 1937, the son has been the owner of the property. The son prays that plaintiff's action be dismissed.

The father, answering separately, admits that plaintiff recovered judgment against him; that no part of the judgment has been paid; the relationship of the parties; that the land was conveyed by him to his son and the deed recorded; and denies all other allegations of plaintiff's petition. Further answering, the father alleged that the conveyance in question here was made in good faith, for a fair and adequate consideration; that at the time of the conveyance he was indebted to the son (and sets out the alleged consideration in detail, to which he later testified) ; that the son is the owner of the land in fee simple; that the conveyance was made for the sole purpose of paying his obligations to his son, which were then "actual, honest and existing and just." The father prays that plaintiff's action be

dismissed. The reply was a denial of new matter in the answer.

The trial court found generally in favor of the defendants; that the transaction was in good faith; that the son paid the full and market value of the land; that the plaintiff's judgment is not a lien upon the real estate here involved, and dismissed plaintiff's action, at its cost.

Plaintiff filed a motion for a new trial, which was overruled.

At the beginning of the trial, it was stipulated that the value of the land, subject to the encumbrances of record at the time of the conveyance, was $8,794.39.

The trial court properly ruled that the burden of proof was upon the defendants. With one exception (noted hereafter) all evidence was offered by the defendants. The testimony of father and son may be summarized as follows: The father inherited this and other land from his father; the father was 66 years old at the time of trial, and all his life had been engaged in general ranching operations on the land here involved. His entire ranch was once free of indebtedness; in 1923 or 1924 he borrowed $25,000 from the Federal Land Bank and secured it by a mortgage on the entire property. In 1929 the father "had to have more money," so the ranch was "split" into what will be referred to herein as the north and the south ranch. At that time, the father conveyed the south ranch to the son. The title to the south ranch is not in issue in this action; however, that transaction and the handling of that land enter into the problem here presented. The north ranch, plus seven or eight hundred acres of unencumbered land, is the land involved in this action. This entire tract will be referred to herein as the north ranch.

As to the conveyance of the south ranch to the son, the father testified: "I was trying to get by with the Federal Land Bank." "I had to have more money, and the only way to get it was the Federal Land Bank would let us take sixteen hundred acres of that south ranch; * * * he (the son) could get ten thousand on that." The son borrowed the

$10,000 on the south ranch and turned that money over to his father. He made no other payment to his father for the conveyance of the south ranch. The father testified that, under oral lease from his son, he continued to operate the south ranch until 1934, when the son took over its operation. There were 800 acres of pasture and 800 acres of hay land on the south ranch. After the conveyance, the father used the pasture and paid the taxes on the entire south ranch "for the use of the pasture." (The disposition of the hay and the payment of interest on the land bank mortgage on the south ranch will be set out later herein.)

At the time of the conveyance of the south ranch to his son, the father borrowed $23,000 on the north ranch (excluding the unencumbered land), and in 1936 made a commissioners' loan thereon.

In 1937 the father was again behind in taxes and interest (he had never been able to meet his current obligations after he borrowed the first money); his cattle were mortgaged for more than their market value to an Omaha bank and were sold by it in June, 1937. That year the father discussed the matter of his loans with the plaintiff's cashier, who suggested that the father go to Omaha and discuss them with the land bank officials. That was done. Officials of the land bank suggested that the father "turn this land over to" his son, that his son kept his payments up and was young; that the father was "going to be around there anyway." The father and son studied it over and the father "deeded this land over to him" in October, 1937. The father, at that time, owed the plaintiff the debt upon which this action is based. The consideration recited in the deed was $6,566.77. Revenue stamps in the sum of $8.50 were attached to the deed.

The actual consideration claimed was the surrender to the father by the son of a promissory note made by the father payable to the son, dated March 10, 1932, for $5,566.77, due December 1, 1933, bearing interest at 5 per cent. *from maturity*. No interest or principal had been paid on the note, and the computed interest due was in excess of $1,000,

but figured in the settlement at $1,000. The principal sum plus $1,000 interest makes the alleged consideration recited in the deed. The other consideration claimed was the assumption and payment by the son of back taxes *on the land* and delinquent interest on the mortgages *on the land.* These four items making a total of more than $8,500, to which defendants add $21,849.39 and $5,000 principal due on the mortgages, reach a grand total in excess of $35,500 (approximately $9 per acre) which defendants contend the son paid for the land. The son testified that he assumed the obligations to the land bank and the commissioners' loan. However, the deed recites that the conveyance is subject to those encumbrances, unpaid interest, unpaid taxes, and tax liens.

The original note introduced in evidence by the defendants does not show an indorsement of payment. The history of the note and the consideration therefor testified to by the defendants is as follows: The father testified that he owed the son for three years' hay and three years' wages, and that he gave the son the note in March, 1932, "for what I owed him then." The note was made out by the son and signed by the father. The son worked for the father on a salary from February, 1929, to February, 1932. The father testified "I was paying him $100 a month." The son testified that his salary was "estimated." In any event, the father testified that he owed the son $3,600 for those three years' wages. The other alleged consideration for the note was the purchase by the father from the son of the son's share of the hay on the south ranch estimated at 350 tons for each of the years 1929, 1930, and 1931, figured at $5 a ton for 1929 ($1,750), $5 a ton for 1930 ($1,750), $8 a ton for 1931 ($2,800), a total of $6,300 for hay, to which defendants add the $3,600 for wages, making a grand total of $9,900 that the father testified he owed the son in March, 1932.

As against that total, credits were allowed first for payments of wages to the son. Payment was by check. The checks were destroyed. The check stubs were produced, but

not admitted in evidence, and it was stipulated that the father paid the son $900 in wages in 1929, $1,300 in 1930, $650 in 1931, and $50 in February, 1932 (a total of $2,900 in wages that had been paid). This leaves $700 alleged to be due as wages. It was also stipulated that the father paid interest to the land bank upon the mortgage debt on the south ranch of $181.25 in 1929, $625.48 in 1930, and $626.50 in 1931. The total of taxes and wages paid amounts to $4,333.23, for which the father claimed credit against his son in March, 1932, when the note was alleged to have been given. The father testified: "I paid him" wages and "I paid interest on his loan * * * on his land, because he had nothing but what he was getting from me to pay with." When the above credits are deducted there is a balance of $5,566.77, for which the note was given.

The hay which the father claims to have purchased from the son was harvested from the south ranch which the father conveyed to the son in 1929. The father testified that his son "put hay up on all my stuff and his own too, and he was getting half of the hay; they always put hay up at that time on halves." (This, however, was during the time that the son was being paid the "going wages" as ranch foreman for his father.) "There was eight hundred acres of hay at that time down on Lyle's (son) place; then I would pay him whatever this hay was worth; there was about three hundred and fifty tons of it, we figured each year * * *." The son testified that his father "bought half of my hay each year; he got the first half for putting it up and the second half he bought from me each year." As to the value of the hay, the son testified "he paid me $5 a ton for the hay" the first two years and "the third year hay was high and we estimated that the hay would be worth about $8 a ton."

On cross-examination, the father identified, and there were received in evidence, his property statements, showing assets and liabilities, given to the plaintiff and to the Omaha bank during the years here in question. The property statement given by the father to the Omaha bank on November

18, 1929, lists among his assets "1,500 T hay $6,000" ($4 per ton as against the $5 per ton calculated in arriving at the amount of the note). The property statement given the plaintiff by the father, dated November 16, 1931, shows "1,400 T hay $6.00   840.00" (should be $8,400) ; the property statement given the Omaha bank, dated January 30, 1932, shows "800 tons hay @5.  $4,000," and a similar statement of November 1, 1933, shows "1,200 tons hay at $5.00 $6,000.00." (These values in the property statements are to be contrasted with the $8 per ton "estimated" as the value of the hay in calculating the amount of the note.)

These property statements were made for the purpose of bolstering credit for renewal and securing of loans. The land involved in this action is shown as an asset in the statements. The father testified that they were made out by plaintiff's and the Omaha bank's cashier. Obviously, they would show the father's assets in the best light; the father testified, "It wasn't unusual they made them out to make it look good to get your money." None of these statements shows the alleged indebtedness of the father to his son as evidenced by the note (however, it was testified that other unsecured indebtedness also was not shown). The father testified that he was told to put in the property statements only what he owed the banks and things of record; that "it would make it look better" to keep the "other stuff" out.

There is no testimony that the father ever told the plaintiff of this alleged indebtedness to the son. The plaintiff's cashier testified that he did not know of the alleged debt of the father to the son until after the deed here in question was recorded. There is no evidence that any one except the father and son ever saw the note or knew of its existence or the existence of the debt it is alleged to represent. Although the son denied knowledge of this debt of the father to the plaintiff, the evidence establishes that the son knew of his father's business conditions generally, that the father was insolvent when this conveyance was made, and that the son knew of that insolvency.

The son made no personal tax returns prior to 1934, did not at any time list this note for taxation, and did not make an income tax return to the federal government for 1937, the year the note was alleged to have been paid by the conveyance here in question.

Neither the father nor the son kept any books or other records of their indebtedness to each other. The credits which the father claimed as against the $9,900 alleged debt to the son were all shown by check-book stubs, as having been paid to or for the son.

Both father and son categorically testified that it was not their intention and that the conveyance was not made for the purpose of cheating, defrauding, hindering, or delaying the father's creditors in the collection of their debts.

The father further testified: "I couldn't keep it up so I *turned* it to him; the land had always been in my father's name and it was handed down; and I thought maybe he could work it out until he could hold it; I couldn't keep it any longer." The son testified that his father "had no way of carrying it, and I have had to assume the responsibility, and I had to have something to do it with;" and again, "I had put about fifteen years of work in there; I got my spending money for a while out there, and then my salary was estimated later on; but year after year I worked out there without any wages or anything but spending money."

After the conveyance of this land to the son in 1937, the father had no property left in his name and had no property at the time of the trial. He was asked, "And you don't ever intend to pay this debt, do you?" He answered, "It is according to what will happen, if *we* happen to have a downpour with plenty of rain and things pick up * * *."

The father now looks after both ranches for the son.

Upon a trial *de novo*, does equity require a cancelation of the deed as to the plaintiff?

"Every conveyance * * * in writing or otherwise, of any estate or interest in lands * * * made with the intent to hinder, delay or defraud creditors or persons, of their lawful rights, damages, forfeitures, debts or demands * * *

as against the persons so hindered, delayed or defrauded shall be void." Comp. St. 1929, sec. 36-401.

"The question of fraudulent intent in all cases arising under the provisions of this chapter shall be deemed a question of fact, and not of law, and no conveyance or charge shall be adjudged fraudulent, as against creditors or purchasers, solely on the ground that it was not founded on a valuable consideration." Comp. St. 1929, sec. 36-405.

"A debtor in failing or insolvent circumstances may prefer one creditor notwithstanding the fact it may be to the exclusion of others, and this rule may include relatives of the debtor who are his creditors." *National Bank of Commerce v. Chapman,* 50 Neb. 484, 70 N. W. 39.

However, "A deed by a father to his son is presumptively fraudulent as to an existing creditor, and in litigation between him and the parties to the conveyance over its alleged invalidity the burden is on them to establish the good faith of the transaction by a preponderance of the evidence." *Lincoln Trust Co. v. Sweeney,* 124 Neb. 686, 248 N. W. 67. See, also, *Riggs v. Hroch,* 133 Neb. 260, 274 N. W. 598.

"It is a well-established rule that, where a transfer of land is made by a debtor to a near relative in consideration of a past-due indebtedness, the burden rests upon the grantee in a creditor's suit to show that the debt was genuine, that his purpose was honest, and that he acted in good faith in obtaining title. Such transactions are looked upon with suspicion, and the suspicion continues until the grantee shows the good faith of the transfer by clear and satisfactory evidence. Generally, when the transaction is in fraud of creditors, knowledge thereof rests only with the near relatives, or others in privity with the debtor. *When the testimony relied upon to show good faith is given by interested relatives only, the reasonableness or unreasonableness of their evidence has considerable weight in arriving at a just conclusion."* *Flint v. Chaloupka,* 78 Neb. 594, 111 N. W. 465.

We have then a conveyance that is presumptively fraudulent. Two considerations are claimed: One is the taking

of the land subject to certain past-due indebtedness and taxes which the son has subsequently paid. This, however, is in the same category as the mortgages against the property. It is not in the classification of a payment moving from the son to the father. The other alleged consideration is a past-due indebtedness, and is the only consideration referred to in the deed. The major consideration for the note was the hay which the son is alleged to have sold the father. This hay was harvested on land which the father conveyed to the son in order that it might be used to secure a loan which a lender would not make to the father, but would make to the son. The father received the entire proceeds of the loan, and thereafter, for the period covered by the transaction involved in the note, the father paid the taxes on the land and the interest payments to the mortgagee. These are charges which the father would have been called upon to pay had he personally secured the loan and continued as the record owner. The father continued to operate the south ranch after the conveyance. The father's testimony indicates that the hay, claimed to have been purchased from the son, was the son's share for harvesting the hay. This testimony is inconsistent with the claim that the son was an employee of the father, and is in conflict with the son's statement that the father received half of the hay "for putting it up" and bought the son's (landlord's) share, being the other half. There are the following additional facts that cast doubt upon this transaction and the execution of this note, alleged to have been made five and one-half years before the conveyance, and upon the testimony that the note was given for the consideration shown and at the time claimed. (1) The difference between the price of the hay, "estimated" in arriving at the amount of the note, and the value of hay shown on the property statements. (2) Neither father nor son kept any books of record, every credit given the father was evidenced by payment by check, and not one cent was credited otherwise. (3) The note did not provide for the payment of interest for the first 20 months. (4) Without the note, the alleged

debt would have been barred by the statute of limitations at the time of the conveyance—a circumstance which we have the right to consider in determining the good faith of the transaction (27 C. J. 539). (5) The secrecy surrounding the transaction and the existence of the alleged debt and note evidencing it. (6) The original note, in evidence, bears no indorsement of payment at the time of its surrender to the father. (7) There was no change, known to any one except father and son, in the operation of the south ranch following the conveyance of 1929, and no shifting from the father to the son of the primary task of meeting current obligations thereon. This evidence considered as a whole points to the conclusion that the hay belonged to the father, not the son, and that the alleged sale of the hay to the father was an afterthought in time of trouble.

There remains the matter of a balance of $700 which both father and son testify was owing to the son for wages. The defendants' testimony as to the origin of this balance of the debt, as set out herein, is far from satisfactory. It is intermingled with and subject to the same criticism that we express as to the hay transaction. However, accepting the claim of wages due, it can be but for $700 and interest as against a stipulated value of $8,794.39 for the land conveyed. As to that, this court has held:

"In a contest between a vendee and creditors of the vendor, the adequacy of the consideration, if it be a valuable consideration, will not be inquired into except for the purpose of throwing light on the intention of the parties." *Jones v. Dunbar,* 52 Neb. 151, 71 N. W. 976.

However, "It is not proper for a creditor to receive in settlement of his debt against an insolvent debtor property materially greater in value than the debt paid thereby." *Slosburg v. Hunter,* 136 Neb. 324, 285 N. W. 563.

Gross inadequacy of consideration is a badge of fraud and a circumstance tending to show knowledge of fraud and participation in it. 27 C. J. 484.

We reach the conclusion that there is no adequate consideration shown for the conveyance from the father to his son.

"Fraudulent intent may be established by proof of facts from which such inference may be reasonably drawn." *Peterson v. Wahlquist,* 125 Neb. 247, 249 N. W. 678; *Riggs v. Hroch, supra.*

" 'A conveyance is declared to be fraudulent when its object or effect is to defraud another, or the intent with which it is made is to avoid some duty or debt due by or incumbent upon the party making the transfer.' 27 C. J. 415." *Butke v. Nachschoen,* 133 Neb. 366, 275 N. W. 318; *Farmers Elevator Co. v. Peck,* 134 Neb. 305, 278 N. W. 499.

"We do not understand the rule to be that it is necessary to prove a specific intent. The intent may be gathered from the acts of the parties, and a conveyance becomes fraudulent in law when it is shown that it was made for the purpose of placing the property beyond the reach of creditors, or that it would hinder or delay them in collecting their just demands." *Becker v. Linton,* 80 Neb. 655, 666, 114 N. W. 928.

"As to an existing creditor, a conveyance by the debtor to delay collection of the debt is declared by statute to be void. Comp. St. 1929, sec. 36-401." *Lincoln Trust Co. v. Sweeney, supra.*

What was the intent and the effect of this conveyance? Looking at the situation generally, we have a father who inherited land from his father and who desired to pass it down to his son. Once prosperous, he became financially involved and conveyed a part of his land to his son to secure needed finances. Repeated losses continued an inability to meet his obligations as they accrued and finally produced insolvency, the sale of his cattle, etc., by secured creditors, and the conveyance of his remaining land to his son. The testimony shows that the conveyance was to withdraw the land from the reach of unsecured creditors, to preserve the land from secured creditors, and to preserve an admitted equity therein for the son, if not for the father and son. The evidence of the origin of the debt that constitutes the foundation of the claim of the son is unsatisfactory and unconvincing. It is obvious that the conveyance to the son

has not only delayed, but, if permitted to stand, has the effect of entirely preventing the plaintiff from the collection of its judgment by execution at law.

Such is its natural and obvious result. The proper conclusion is that the father and son intended that such a result would follow from the conveyance. The law wraps a presumption of fraud around a transaction of this character. The defendants have failed to overcome and remove that presumption. It follows that the conveyance, as against this plaintiff, is void, and that the plaintiff was entitled to the relief for which it prayed.

The decree of the district court is reversed, and, as against the plaintiff, the conveyance to the defendant Lyle P. Dierks of the land described in plaintiff's petition is declared null and void, and is annulled and set aside. All costs are taxed to the defendants Lyle P. Dierks and M. H. Dierks.

REVERSED AND REMANDED.